Jason P. Kathman (State Bar No. 24070036)
**SPENCER FANE LLP**
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email: jkathman@spencerfane.com

*Special Counsel to the Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ROBERT JORDAN** | § | |
| **CONSTRUCTION, LLC** | § | **CASE NO. 22-41804-elm7** |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |
| | § | |
| **JOHN DEE SPICER** | § | |
| | § | |
| Plaintiff, | § | **ADVERSARY NO. _____** |
| | § | |
| | § | |
| v. | § | |
| | § | |
| **QUEEN FUNDING LLC;** | § | |
| **APEX FUNDING SOURCE LLC;** | § | |
| **FIJI FUNDING LLC; MOE GREENES;** | § | |
| **and PINNY BAK** | § | |
| | § | |
| Defendants. | § | |

## ADVERSARY COMPLAINT

TO THE HONORABLE EDWARD L. MORRIS
UNITED STATES BANKRUPTCY JUDGE:

John Dee Spicer, Plaintiff and Chapter 7 Trustee in the above-styled bankruptcy case

("**Plaintiff**" or "**Trustee**"), by and through his undersigned counsel, files this Adversary Complaint

(the "**Complaint**") against Queen Funding LLC ("**Queen**"), Apex Funding Source, LLC

("**Apex**"), Fiji Funding LLC ("**Fiji**"), Moe Greenes ("**Greenes**") and Pinny Bak ("**Bak**" and

**TRUSTEE'S ADVERSARY COMPLAINT – Page 1 of 24**

together with Queen, Apex, Fiji, and Greenes, collectively the "**Defendants**"). In support thereof, Plaintiff would respectfully show the Court the following:

### Nature of the Action

1.      This is a RICO, usury, and fraudulent transfer action against a number of merchant cash advance ("**MCA**") companies and their principals that prey on cash-strapped businesses like the Debtor by perpetuating a scheme of making unlawful usurious loans and fraudulently collecting millions of dollars from their victims. Over the course of approximately a year, Robert Jordan Construction, LLC ("**Debtor**") entered into a number of so-called "Merchant Cash Advance Agreements" (the "**MCA Agreements**") with each of the Company Defendants,[1] pursuant to which the Company Defendants transferred lump sums of money to the Debtor for the alleged purpose of purchasing, at a discount, something that did not even exist—the Debtor's future receipts. Although marketed and described as a "purchase of future receipts," the agreements' terms and conditions, along with the Defendants' actions, demonstrate that, regardless of the form of the agreements, no sale of receipts ever occurred and the form was merely used to avoid applicable usury laws. In truth, the transactions were loans that charged usurious interest at rates far in excess of the amounts allowed by Texas law. Alternatively, to the extent that the Court does not determine that the agreements are disguised loans and the Defendants paid usurious interest, the amounts paid were made while the Debtor was insolvent and it did not receive reasonably equivalent value. As such, the over $2 Million swept from the Debtor's bank accounts are also fraudulent transfers avoidable pursuant to chapter 5 of the Bankruptcy Code.

---

[1] "**Company Defendants**" shall mean collectively Queen, Apex, and Fiji.

## PARTIES

2.      Plaintiff, John Dee Spicer, is the Chapter 7 Trustee in the above-referenced bankruptcy case. He may be served through his undersigned counsel.

3.      Upon information and belief, Defendant, Queen Funding LLC is a limited liability company organized and existing under the laws of the State of New Jersey. It can be served with process by serving its registered agent for service, Israel Reches, located at 200 Central Ave., New Jersey, 07727-3788.

4.      Upon information and belief, Defendant, Apex Funding Source LLC is a limited liability company organized and existing under the law of the State of New York. It may be served with process by serving its registered agent for service, VCorp Agent Services, Inc., 1200 S Pine Island Road, Plantation, Florida 33324, or at its principal place of business located at 2875 NE 191 St., Unit 304, Aventura, Florida 33180.

5.      Upon information and belief, Defendant, Fiji Funding LLC is a limited liability company organized and existing under the laws of the State of New Jersey. It may be served by serving its registered agent for service, The LLC, 101 Chase Ave., Suite 208, Lakewood, New Jersey, 08701.

6.      Upon information and belief, Defendant, Moe Greenes, is an owner and principal of Fiji. He may be served at either 501 Manchester Ave., Toms River, NJ 08755, or at his place of business, 101 Chase Avenue, Suite 208, Lakewood, New Jersey 08701.

7.      Upon information and belief, Defendant, Pinny Bak, is a principal of Apex. He may be served at Apex's principal place of business, 2875 NE 191 St., Unit 304, Aventura, Florida 33180.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. 1334.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and/or 1409.

## BACKGROUND

### A.      The Predatory MCA Industry

10.     MCAs are a kind of alternative financing that purports to be a sale of a percentage of future receivables.[2] As two scholars have observed, the concept is an interesting one because it is both legally and metaphysically impossible to transfer property before it exists.[3] In a typical MCA transaction, the debtor gets an immediate infusion of cash and agrees to pay the lender (aka "purchaser") a specified percentage of its future daily receipts.[4] The MCA lender accomplishes the daily recovery by either requiring the debtor to direct all of its receipts to a particular merchant that the MCA lender solely has access to, or requires the debtor to give the MCA Lender authority to daily withdraw amounts out of the debtor's bank account via Automated Clearing House (ACH).[5] The daily amount drawn is usually set as a percentage of the debtor's daily receipts, but very commonly the merchant cash advance agreement will also have a provision that allows the MCA to just ACH a specified amount each day as an "estimate" of what the "specified percentage" would be. The daily withdrawal is a hallmark of MCA transactions, and, for the reasons described below, so are the "reconciliation" provisions.

---

[2] Kara Bruce, *The Murky Process of Characterizing Merchant Cash Advance Agreements*, 42 No. 4 Bankr. Law Letter NL 1 (April 2022).
[3] *See* John F. Hilton & Stephen L. Sepinuck, A "Sale of Future Receivables: Disguising A Secured Loan as a Purchase of Hope.") 9 Transactional Law. 14, 15-16 (2019).
[4] *See In re Hill*, 589 B.R. 614, 619 (Bankr N.D. Ill. 2018)("In an MCA transaction, the merchant sells its accounts receivable for a discounted amount that is paid by the MCA company up-front. The MCA company, as purchaser, recovers the receivables by taking a pre-determined percentage of the merchant's receipts until the MCA company is paid in full.").
[5] *See supra Note* 4.

**TRUSTEE'S ADVERSARY COMPLAINT – Page 4 of 24**

11.     In response to multiple articles, the New York Attorney General just filed a 280-page lawsuit against one particular MCA and its various subsidiaries and affiliates.[6]

**B.      The MCA Agreements are Substantively and Procedurally Unconscionable.**

12.     The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length.

13.     The MCA Agreements contain one-sided terms that take advantage of the desperation of small businesses and their individual owners and help hide the fact that the transactions, including those involving the Debtor, are really loans.

14.     The one-sided terms of the MCA Agreements include the following: (1) a provision giving the Defendants the irrevocable right to withdraw money directly from the Debtor's bank accounts, including collecting checks and signing invoices in the Debtor's name, (2) a provision preventing Debtor from transferring, moving or selling the business or any assets without permission from the applicable Defendant, (3) a one-sided attorneys' fee provision obligating the merchant to pay the Defendant's attorneys' fees but not the other way around, (4) venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of the of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) an agreement to execute an assignment of lease of merchant's premises in favor of the Defendant, (10) the right to direct all credit card processing payments to the Defendant, (11) a power-of-attorney "to take any action or execute any instrument or document to settle all obligations due…."

---

[6] *See* https://ag.ny.gov/press-release/2024/attorney-general-james-sues-large-scale-predatory-lending-operation-targeting

15.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements. Among the knowingly false statements are the representations and statements that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the Defendant to charge an exorbitant ACH Program Fee or Origination Fee.

**C.     Disguised Transactions That are Really Loans.**

16.     In an attempt to avoid state usury laws, the MCA Agreements include illusory reconciliation provisions to give the appearance that the loans do not have a definite term.

17.     Although disclaimed as a loan, the MCA Agreements are, in economic reality, loans that are repayable. The MCA Agreement include such hallmarks of a loan, including:

a.   The daily payments required by the MCA Agreements were fixed and the so-called reconciliation provision was a mere subterfuge to avoid usury laws. Rather, just like any other loan, the purchased amount was to be repaid within a specified time.

b.   The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the purchased amount.  The loans seek to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of being maintained in the account, the merchants were in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing.

c.   While the MCA Agreements purport to "assign" all of the merchant's future account receivables to the Defendant until the purchased amount was paid, the merchants retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Defendants merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount.

d.   Unlike true receivable purchase transactions, the MCA Agreements were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor.

e.  The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Defendant based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, the Defendant did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value.

f.  The amount of the daily payments was determined based upon when the Defendant wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

g.  The Defendants assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements.

h.  The Defendants required that the merchants undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Defendants from any risk of loss resulting from the merchant's failure to generate and collect receivables.

i.  The Defendants required that the merchant grant them a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and the Defendants knew were breached from day one.

## Underlying Facts

### A.    RJ Construction

18.    Debtor, Robert Jordan Construction, LLC, was a respected general contractor and roofing company in the Dallas Fort Worth metroplex. In February 2020, after Winter Storm Uri hit much of the southwest United States and knocked out power to many parts of north Texas, Debtor was called upon to assist with the cleanup at a local high school. The Arlington Independent School District ("**AISD**") hired the Debtor to address massive flooding and mold remediation that had occurred when pipes burst in the school due to the extreme cold temperatures. Unfortunately, after the Debtor finished the work, AISD refused to pay for the services, alleging that the value of

**TRUSTEE'S ADVERSARY COMPLAINT – Page 7 of 24**

Debtor's work was not worth the amount AISD has contracted to pay. Very quickly, vendors who had provided labor and materials for the AISD job, as well vendors related to other work the Debtor had performed, started asking for money owed on outstanding invoices.

19.    Strapped for cash, Debtor entered into the MCA Agreements with the Defendants. The MCA Agreements each generally provide that the "Merchant" (Debtor) will sell a specified percentage of its future receivables in exchange for a specified percentage of RJC's daily receipts. Over a period of approximately a year, Debtor borrowed, in the aggregate, over $2.75 Million from the Company Defendants. During approximately that same amount of time, the MCA Lenders withdrew from RJC's accounts over $2 Million and alleged that they were still owed approximately $3.6 Million.

**B.    The Queen Financing Loan.**

20.    Between January 2021 and January 2022, Queen loaned the Debtor approximately $539,197.33. During that same period of time, Queen withdrew approximately $707,537.50 (the "**Queen Withdrawals**") from the Debtor's bank accounts, and asserted that it was still owed $351,000.00.

21.    On or about April 22, 2021, the Debtor and Queen executed that certain Standard Merchant Cash Advance Agreement (the "**Queen MCA Agreement**") in north Texas. Pursuant to the Queen MCA Agreement, the Debtor was to have received "net funds" of $689,975.00 for the alleged "purchase" of $1,072,500.00 (the "**Queen Receivables Purchased Amount**") of future receipts. The Queen MCA Agreement then provided that the Queen Receivables Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $9,696.69 (the "**Queen Daily Payment**") such that the Queen Receivables Purchased Amount would be repaid in just one hundred and eleven (111) days, yielding an annual interest rate of greater than 182% per annum

(over ten times the maximum 18% permitted by Texas law). Further, the Queen MCA Agreement provides *inter alia* that: "The amount that QUEEN will collect from [Debtor] towards the [Queen Receivables Purchased Amount] during any specific DAY will be capped at $2,143.00 (the "Cap")." Notwithstanding this plain language in the contract, Queen routinely and consistently collected more than $2,143.00 per day, including a span of fifty separate instances of collecting $6,899.75 per day from April 26, 2021 to July 6, 2021. As additional disguised usurious interest, Queen charged Origination and ACH debit program fees of $25,025.00 and withheld such amounts from the funding. Upon information and belief, Queen provided little diligence in underwriting the loan and the actual costs of the ACH withdrawals were a fraction of the fee. In fact, the amounts withheld were merely just disguised interest.

### D.    APEX Funding Loans

22.    Over approximately a one-year period, between January 2021 to January 2022, Apex loaned the Debtor approximately $490,790.00. During approximately the same period of time, Apex withdrew approximately $838,303.35 (the "**Apex Withdrawals**") from the Debtor's bank accounts, and asserted that it was still owed $930,000.00.

23.    On or about August 16, 2021, Debtor and Apex executed a Merchant Cash Advance Agreement (the "**First Apex MCA Agreement**") in north Texas. Pursuant to the First Apex MCA Agreement, the Debtor was to have received $370,000.00 (the "**First Apex Purchase Price**") in exchange for "all of Debtor's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers and/or third party payors" until full payment of $555,000.00 (the "**First Apex Receivables Purchased Amount**"). The First Apex MCA Agreement provides that the First Apex Receivables Purchased Amount would be repaid via daily withdrawals of $4,300.00, such that the First Apex Receivables Purchase Amount would be

repaid in just one hundred twenty-nine (129) days, which on its face translates into an annual interest rate of 283% per annum, fifteen times the amount allowed under Texas law.

24.    Subsequently, on October 28, 2021, Debtor and Apex executed an additional Standard Merchant Cash Advance Agreement (the "**Second Apex MCA Agreement**") in north Texas. Pursuant to the Second Apex MCA Agreement, Debtor was supposed to borrow an additional $550,000.00 (the "**Second Apex Purchase Price**"), again, in exchange for Apex's purported purchase of all of Debtor's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers and/or third party payors" until full payment of $825,000 (the "**Second Apex Receivables Purchased Amount**"). The payback on the Second Apex MCA Agreement was 141 days such that $5,870.00 would be deducted daily from the Debtor's bank accounts, a return of 258% per annum, fourteen times the legal amount allowed by Texas law.

**E.    FIJI Funding Loans**

25.    Upon information and belief, over approximately an eight-month period, between May 2021 to January 2022, Fiji loaned the Debtor approximately $1,719,796.00. During that same amount of time, Fiji withdrew approximately $726,818.67 (the "**Fiji Withdrawals**") from the Debtor's bank accounts, but asserted that it was still owed $2,310,000.00, more than had ever been advanced.

26.    On or about August 25, 2021, Debtor and Fiji executed a Standard Merchant Cash Advance Agreement (the "**First Fiji MCA Agreement**") in north Texas. Pursuant to the First Fiji MCA Agreement, Fiji agreed to provide funds to the Debtor in the amount of $855,000.00 Debtor in exchange for the purported purchase of all of Debtor's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from the Debtor's customers and/or

third party payors until fully payment of $1,282,500.00 (the "**First Fiji Receivables Purchased Amount**"). The First Fiji MCA Agreement provides that the First Fiji Receivables Purchased Amount would be repaid via daily withdrawals of $11,100 per day, such that the First Fiji Receivables Purchased Amount would be repaid in one hundred sixteen (116) days, which on its face translates into an annual interest rate of 314% per annum, seventeen times the percentage allowed by law.

27.    Subsequently, on January 3, 2022, Debtor and Fiji executed another Standard Merchant Cash Advance Agreement (the **"Second Fiji MCA Agreement"**) in north Texas. Pursuant to the Second Fiji MCA Agreement, the Debtor was to have received $945,000 in exchange for the purported purchase of all of Debtor's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers and/or third party payors until fully payment of $1,471,500.00 (the "**Second Fiji Receivables Purchased Amount**"). The Second Fiji MCA Agreement provides that the Second Fiji Receivables Purchased Amount would be repaid via daily withdrawals of $9,600 per day, such that the First Fiji Receivables Purchased Amount would be repaid in one hundred fifty-four (154) days, which on its face translates into an annual interest rate of 237% per annum, thirteen times the percentage allowed by law.

**F.    The Bankruptcy.**

28.    After the Company Defendants had effectively stripped the Debtor of all of its cash, on August 9, 2022, RJ Construction, LLC ("**Debtor**") filed a petition for bankruptcy under Chapter 7 of the United States Bankruptcy Court.

29.    John Dee Spicer was appointed the Chapter 7 Trustee.

**TRUSTEE'S ADVERSARY COMPLAINT – Page 11 of 24**

## Causes of Action

### Count One
### (RICO)
### 18 U.S.C. § 1962

30.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

**A.      Unlawful Activity.**

31.     Texas has strict laws on the charging of usurious interest. *See* TEX. FIN. CODE § 302. Similarly, New York places limits on the amount of interest that can be charged related to a loan. *See e.g.* NY Gen Oblig. L. § 5-501.

**B.      Culpable Persons.**

32.     Each of the Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property (the "**RICO Persons**"). More specifically, Queen, Apex, and Fiji are all believed to be limited liability companies, and Greenes and Bak are both individuals.

33.     At all relevant times, each of Defendants were, and are, a person that exists separate and distinct from the Enterprise, described below.

34.     Upon information and belief, Greenes has an ownership interest in Fiji, and Bak is a principal of Apex.

35.     Through the operation and use of Company Defendants, the RICO Persons solicit, underwrite, fund, service and collect upon unlawful debt (as that term is defined within the meaning of 18 U.S.C. § 1961(6)), and engage in wire fraud. More specifically, the RICO Persons engaged in wire fraud by furthering the fraudulent scheme of holding the MCA Agreements out as

"purchases" when in fact they are loans through use of emails, and by withdrawing the daily

amounts from the Debtor via ACH.

### C.    The Enterprise.

36.    Queen, Apex, Fiji, Greenes, and Bak constitute an Enterprise (the "**Enterprise**")

within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

37.    Queen, Apex, Fiji, Greenes, and Bak are associated in fact and through relations of

ownership for the common purpose of carrying on an ongoing unlawful enterprise. Specifically,

the Enterprise had a common goal of soliciting, funding, servicing and collecting upon usurious

loans that charge interest at more than twice the enforceable rates of Texas, New York, and other

states, and doing so through fraudulent means; principally, by describing the transactions as

purchases instead of loans.

38.    Each of the RICO Persons routinely communicated with each other about the

transactions. Further, Greenes communicated with the Debtor on behalf of each of Queen, Apex,

and Fiji, and facilitated not only the usurious loans to the Debtor from those entities, but also

solicited further loans to the Debtor, and facilitated communications with each of the Defendants.

The RICO Persons carried out the purpose of the Enterprise for over a year, and would have

continued to prey upon the Debtor but for the bankruptcy.

39.    The debt, including such debt evidenced by the multiple MCA Agreements

(including the Queen MCA Agreement, the First Apex MCA Agreement, Second MCA Agreement,

Fiji First MCA Agreement, and Second Fiji MCA Agreement), constitutes unlawful debt within

the meaning of 18 U.S.C. §§ 1961, 1962(c) and (d) because it involves the business of lending

money at a rate usurious under State or Federal law, where the usurious rate is at least twice the

enforceable rate. More specifically, here the Defendants loaned money at more than twice the usurious rate under both Texas and New York law.

40.      The Enterprise's conduct also constituted "fraud by wire" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined in 18 U.S.C. § 1961(1). More specifically, the RICO Persons engaged in wire fraud by furthering the fraudulent scheme of holding the MCA Agreements out as "purchases" when in fact they were loans. They perpetuated this fraud through the use of emails and by routinely withdrawing funds from the Debtor's bank account via ACH. The continued use over time to conduct the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

41.      The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purpose of collecting upon unlawful debts including as follows:

*i.    Moe Greenes*

42.      Greenes is believed to be the Managing Partner of Fiji, and an investor or principal in Queen and/or Apex. Greenes solicited, documented, and serviced most of the MCA Agreements with Queen, Apex, and Fiji. In his capacity as a principal and agent for each of Queen, Apex, and Fiji he facilitated and directed: (i) the form of the MCA Agreements used by the Enterprise to attempt to disguise the unlawful loans as receivables purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; and (ii) the method of collecting the daily payments via ACH withdrawals. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Debtor.

### ii.    *Queen Funding, APEX and Fiji*

43.    Each of Queen, Apex, and Fiji exists to perpetuate and collect on unlawful debt. Collection of unlawful debt itself violates RICO even without a "pattern" or "racketeering activity." *See e.g. United States v. Weiner*, 3 F.3d 17, 24 (1st Cir. 1993); *United States v. Pepe*, 747 F.2d 632, 645 (11th Cir. 1987); *United States v. Tocco*, 200 F.3d 401, 406 (6th Cir. 2000). Nevertheless, Queen, Apex, and Fiji have each: (i) underwritten the usurious loans and determined the amount of interest to charge on the loans, which it knew was usurious, (ii) entered into the so-called MCA Agreements on behalf of the Enterprise, (iii) serviced the usurious loans, and (iv) setup and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debts.

### E.    Interstate Commerce.

44.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities.

45.    Specifically, the members of the Enterprise are believed to be located in New York and New Jersey and use personnel in those states to originate, fund, service, and collect upon the usurious loans made by the Enterprise to entities, like the Debtor, in other states such as Texas and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through ACH and wire transfers.

46.    In the case of the Debtor, the communications and interactions between the members of the Enterprise and the Debtor were by interstate email and text, interstate wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service, and collect upon the MCA Agreements, fund the

advances under each of the MCA Agreements and collect the daily amounts the Enterprise withdrew from the Debtor's bank accounts.

**F.  Injury and Causation.**

47.  The Debtor was harmed and irreparably injured in its business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

48.  The injuries to the Debtor are directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected usurious loan payments, and the utter destruction of the Debtor's entire business.

49.  Pursuant to 11 U.S.C. § 1964(c), Trustee is entitled to treble damages, plus costs and attorneys' fees from Defendants.

**Count Two
(RICO Conspiracy)
<u>18 U.S.C. § 1962(d)</u>**

50.  Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

51.  Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

52.  By and through each of the Defendants' business relationships with each other, their close coordination with one another in the affairs of the Enterprise, and email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.

Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

53.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements.

54.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). More specifically, over the year plus period, the RICO Persons:

- continually texted and emailed the Debtor and its principal, Robert Jordan, soliciting additional loans described as transaction in furtherance of a fraudulent scheme in violation of 18 U.S.C. § 1343 (wire fraud);

- entered into at least five separate MCA Agreements with the Debtor via email and electronic communications, describing the transactions as purchases, when in fact they were loans, resulting in over $2.7 Million loaned to the Debtors in violation of 18 U.S.C. § 1343; and

- initiated over 800 separate ACH withdrawals, totaling over $2.2 Million in withdrawals in violation of 18 U.S.C. § 1343, and 18 U.S.C. 1962(c) (collection of unlawful debt).

55.     The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

56.    The Debtor was irreparably harmed and injured by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

57.    The injuries to the Debtor directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but at not limited to, millions of dollars in improperly collected loan payments.

58.    The Debtor and the Debtor's bankruptcy estate has suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' wrongful acts.

59.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**Count Three**
**(Breach of Contract)**

60.    Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

61.    The Queen April 2021 MCA Agreement constitutes a contract between the Debtor and Queen. The Debtor's performance under the contract was excused because the contract constitutes an unenforceable usurious loan.

62.    Queen breached the agreement by charging and withdrawing from the Debtor's bank accounts, on multiple days, an amount in excess of the $2,143.00 "Cap."

63.    As a result of Queen's breach, the Debtor was damaged in an amount to be determined by the Court at trial. Plaintiff requests that this Court award Plaintiff actual economic damages, attorneys' fees and any other damages to which Plaintiff may show itself to be justly entitled.

## Count Four
### (Conspiracy to Breach of Contract)

64.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

65.     Moe Greenes, in combination with two or more persons, including, but not limited to, Queen, agreed to breach the Queen April 2021 MCA Agreement by charging and collecting more than the "cap" allowed under that agreement.

66.     Moe Greenes acted with the intent to cause harm to Debtor.

67.     To accomplish the object of their agreement, Queen actually charged and collected amounts in excess of the "cap" allowed in the Queen April 2021 MCA Agreement.

68.     Queen's breach of the Queen April 2021 Agreement proximately caused injury to the Debtor, and the Debtor suffered damages in an amount to be determined by the Court at trial. Plaintiff requests that this Court award Plaintiff actual economic damages, attorneys' fees and any other damages to which Plaintiff may show itself to be justly entitled.

## Count Five
### (Charging Usurious Interest)
### Texas Finance Code § 301.001 *et seq.*

69.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

70.     The Defendants each loaned various amounts of money to the Debtor.

71.     When taken as a whole, each of the MCA Agreements indicate an absolute obligation of the Debtor to repay the principal.

72.     Each of the Defendants contracted for, charged, and received interest that exceeded the maximum amount allowed by law.

73.     The Defendants' unlawful conduct caused injury to the Debtor, which resulted in damages.

74.     Plaintiff requests that this Court enter judgment in favor of Plaintiff for all damages sustained as a result of Defendants' unauthorized use.  Further, Plaintiff requests statutory damages pursuant to Texas Finance Code Section 305.001 in an amount equal to three times the amount computed by subtracting the amount of interest allowed by law from the total amount of interest contracted for or received. Further, Plaintiff requests that the Court enter judgment awarding any exemplary damages that Plaintiff may be entitled to.  Finally, Plaintiffs requests that the Court award reasonable attorneys' fees and expenses and court costs incurred in recovering the damages and profits under the statue.

### Count Six
### (Conspiracy to Charge Usurious Interest)

75.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

76.     Greenes and Bak, in combination with two or more persons, including, but not limited to, Greenes, Bak, Queen, Apex, and Fiji agreed to charge usurious interest.

77.     Alternatively, Greenes and Bak, in combination with two or more persons, agreed to loan money by unlawful means—charging usurious interest.

78.     Greenes, Bak, Queen, Apex, and Fiji acted with the intent to harm the Debtor.

79.     To accomplish the object of their agreement, each of Queen, Apex, and Fiji charged and received usurious interest from the Debtor.

80.     Queen, Apex, and Fiji's charging of usurious interest proximately caused injury to the Debtor, and the Debtor suffered damages in an amount in excess of the minimum jurisdictional limits of this Court. Plaintiff requests that this Court enter judgment personally against Moe

Greenes for all damages related to Apex, Queen, and Fiji's violation of the usury statutes, including, but not limited to, all economic damages, statutory damages, exemplary damages and attorneys' fees.

**Count Seven**
**(Constructive Fraudulent Transfer)**
**11 U.S.C. §§ 544 and 550; Texas Business and Commerce Code § 24.005(a)(2)**

81.      Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

82.      Additionally and/or alternatively, the Queen Withdrawals, Apex Withdrawals, and Fiji Withdrawals (collectively, the "Withdrawal Transfers") all constituted transfers of the Debtor's property.

83.      At the time of each of the Withdrawal Transfers, the Debtor was either insolvent, or as a result of the Withdrawals Transfers, the Debtor became insolvent. At all relevant times, the Debtor's primary asset was its accounts receivable; however, its accounts receivable were pledged as collateral for loans such that there was no equity in the accounts receivable. Further, the Debtor owed a substantial amount of vendors, such that at all relevant times, the Debtor's liabilities were greater than its assets. Alternatively, at the time of the Withdrawal Transfers, the Debtor was engaged in a business or a transaction, for which the property remaining with the Debtor was unreasonably small capital. Further in the alternative, at the time of the Withdrawal Transfers, the Debtors intended to incur, or believed that it would incur, debts that would be beyond the Debtors' ability to pay as they matured.

84.      Alternatively, and additionally, the obligations created under each of the MCA Agreements were undertaken while the Debtor was either insolvent, or as a result of entering into the MCA Agreement, the Debtors became insolvent.

85.     The Debtor received less than reasonably equivalent value in exchange for the Withdrawal Transfers. More specifically, if the Court determines that the MCA Agreements were not loans and disguised financings, then the amounts paid by each of the Company Defendants for the purchase of whatever asset they purchased was less than the reasonably equivalent value of those assets.

86.     Pursuant to Code §§ 544 and 550, and the Texas Uniform Fraudulent Transfer Act, Plaintiff is entitled to judgment: (a) avoiding the Withdrawal Transfers; (b) directing that the Withdrawal Transfers be set aside; (c) avoiding any obligations created as a result of the MCA Agreements; and (d) recovering the Withdrawal Transfers, or the value thereof, from Defendant for the Trustee and the benefit of the bankruptcy estate.

**Count Eight**
**(Constructive Fraudulent Transfer)**
**11 U.S.C. §§ 548 & 550**

87.     Plaintiff incorporates each of the foregoing paragraphs by reference as if fully set forth herein verbatim.

88.     Additionally and/or alternatively, the Withdrawal Transfers all constituted transfers of the Debtor's property.

89.     At the time of each of the Withdrawal Transfers, the Debtor was either insolvent, or as a result of the Withdrawals Transfers, the Debtor became insolvent. At all relevant times, the Debtor's primary asset was its accounts receivable; however, its accounts receivable were pledged as collateral for loans such that there was no equity in the accounts receivable. Further, the Debtor owed a substantial amount of vendors, such that at all relevant times, the Debtor's liabilities were greater than its assets. Alternatively, at the time of the Withdrawal Transfers, the Debtor was engaged in a business or a transaction, for which the property remaining with the Debtor was

unreasonably small capital. Further in the alternative, at the time of the Withdrawal Transfers, the Debtors intended to incur, or believed that it would incur, debts that would be beyond the Debtors' ability to pay as they matured.

90.     Alternatively, and additionally, the obligations created under each of the MCA Agreements were undertaken while the Debtor was either insolvent, or as a result of entering into the MCA Agreement, the Debtors became insolvent.

91.     The Debtor received less than reasonably equivalent value in exchange for the Withdrawal Transfers. More specifically, if the Court determines that the MCA Agreements were not loans and disguised financings, then the amounts paid by each of the Company Defendants for the purchase of whatever asset they purchased was less than the reasonably equivalent value of those assets.

92.     Pursuant to Code §§ 548 and 550, , Plaintiff is entitled to judgment: (a) avoiding the Withdrawal Transfers bankruptcy estate; (b) directing that the Withdrawal Transfers be set aside; (c) avoiding any obligations created as a result of the MCA Agreements; and (d) recovering the Withdrawal Transfers, or the value thereof, from Defendant for the Trustee and the benefit of the bankruptcy estate.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully request that citation issue and process be served on the Defendants named herein and that, upon final hearing, Plaintiff have and recover judgment from and against Queen Funding LLC, Apex Funding Source, LLC, Fiji Funding LLC, Moe Greenes and Pinny Bak as alleged herein, and for such other and further relief to which Plaintiff may be justly entitled.

Dated: August 6, 2024.                          Respectfully submitted,


                                                */s/ Jason P. Kathman*
                                                Jason P. Kathman (Texas Bar No. 24070036)
                                                **SPENCER FANE LLP**
                                                5700 Granite Parkway, Suite 650
                                                Plano, Texas 75024
                                                (972) 324-0300 – Telephone
                                                (972) 324-0301 – Facsimile
                                                Email: jkathman@spencerfane.com

                                                ***Special Litigation Counsel for
                                                Trustee***